UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------ X
                                                       :

OLEG GERZHGORIN,                :
                                                       :

                    Plaintiff,         :            **REPORT AND**
                                                         :           **RECOMMENDATION**
       -against-             :           1:18-cv-04344 (LDH)(PK)
                                                      :

SELFHELP COMMUNITY SERVICES,  :
INC., and RUSSIAN HOLOCAUST    :
SURVIVORS PROGRAM,          :
                                                       :

                  Defendants.      :
                                                       :
------------------------------------------------------ X

**Peggy Kuo, United States Magistrate Judge:**

      Plaintiff Oleg Gerzhgorin brings this action against Defendants Selfhelp Community Services,

Inc. ("Selfhelp") and the Russian Holocaust Survivors Program ("RHSP," collectively, "Defendants")

for discrimination on the basis of religion, and retaliation in violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and the New York City Human Rights Law, N.Y.C.

Admin. Code § 8-107 *et seq.*  ("NYCHRL") and discrimination on the basis of his age in violation of

the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA") and the

NYCHRL.  (Compl., Dkt. 1.)  The Honorable LaShann DeArcy Hall has referred Defendants' motion

for summary judgment to the undersigned for a report and recommendation.  (Mot. for Summ. J.,

"Mot.," Dkt. 38.)

      For the reasons set forth below, the undersigned respectfully recommends that the Motion be

granted.

## FACTS

      Unless otherwise noted, the following facts are taken from Defendants' Statement of

Undisputed Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1," Dkt. 38-57), Plaintiff's Affirmation in

Opposition to Summary Judgment ("Aff.," Dkt. 43), Plaintiff's Rule 56.1 Statement ("Pl.'s 56.1," Dkt. 44), the transcript of the deposition of Plaintiff, attached as Exhibit AQ to the Declaration of Diane Krebs ("OG Dep.," Dkt. 38-2), and the Affidavit of Mariam Khachatryan ("Khachatryan Aff.," Dkt. 38-13) and its exhibits.

## I.      Plaintiff's Hiring and Job Responsibilities

Plaintiff was born in 1962 in Belarus, then part of the former Soviet Union, and came to the United States in 1995.  (Defs.' 56.1 ¶¶ 28-29.)  He is a licensed social worker and identifies as an Orthodox Jew.  (*Id.* ¶ ¶31-32.)

Defendant Selfhelp is a not-for-profit human services agency providing housing, home health care, and social and community-based services in the New York metropolitan area to elderly, frail, and at-risk individuals.  (*Id.* ¶¶ 2-4.)  RHSP operates the oldest and largest program serving Holocaust survivors in North America, caring for over 4,500 individuals, including many from the former Soviet Union.  (*Id.* ¶¶ 5-6.)  It has a dedicated office in Brooklyn.  (*Id.* ¶ 6.)

Selfhelp receives federal grant money, and as a result, may not use funds to support "explicitly religious activities, such as worship, religious instruction, or proselytization."  (*Id.* ¶¶ 12, 15.)

In May 2017, Plaintiff applied for a job as a social worker with RHSP.  (*Id.* ¶¶ 35-36.)  As part of the application process, he interviewed with RHSP Director Miriam Khachatryan ("Khachatryan"). (*Id.* ¶¶ ¶ 17, 40.)  Khachatryan is not Jewish.  (*Id.* ¶ 18.)  During the interview, Plaintiff was wearing a yarmulke, making it obvious to Khachatryan that he was "an observant Jew."  (*Id.* ¶ 41.)  They did not discuss religious beliefs, but Plaintiff discussed being a descendant of Holocaust survivors.  (*Id.* ¶ 42; Aff. ¶ 11.)  Plaintiff also asked about time off for Jewish holidays and about needing to leave early enough on Fridays to observe the Sabbath.  (Defs.' 56.1 ¶ 43.)  Khachatryan told him that Selfhelp is closed on Rosh Hashanah and Yom Kippur, and that there was a generous leave policy, so holidays should not be a problem; she also explained that she has allowed employees to adjust their work hours

in order to leave early on Fridays.  (*Id.*)  Khachatryan knew Plaintiff was an Orthodox Jew when she made the decision to hire him.  (*Id.* ¶ 45.)

On July 3, 2017, Plaintiff began working for Defendants as a social worker.  (*Id.* ¶ 49.)   His immediate supervisor was Fakhriniso "Fahry" Woolley ("Woolley").  (*Id.* ¶ 50.)  Among Plaintiff's job duties were conducting home visits, maintaining monthly client contact, securing benefits and services for clients, attending monthly "coffee houses" with clients, and recording case notes in client files.  (*Id.* ¶¶ 59, 66, 72, 77, 83.)  These job responsibilities were described in writing and verbally.  (*Id.* ¶ 58.)  The parties had different understandings of these responsibilities.

Plaintiff was told he was expected to make home visits to each of his clients within the first two and a half months of his employment.  (*Id.* ¶ 64.)  These home visits were necessary "to conduct psychosocial assessments and to assess clients for their needs, including evaluating their living environment and social support system."  (*Id.* ¶ 60.)  Plaintiff claimed that there were no written requirements regarding the number of home visits required, so he made independent determinations of whether a home visit was required, based on assessments done by the previous social worker.  (*Id.* ¶ 65.)

Plaintiff was also told he needed to make contact with each client at least once a month.  (*Id.* ¶ 66.)  Plaintiff claimed that the frequency of client contact was not in writing, so he "just used [his] common sense as a social worker" to determine whether a client needed to be contacted, again relying on the assessments of the prior social worker.  (*Id.* ¶ 67.)  Plaintiff also claimed that the agency's "emergency protocol" only needed to be followed if the worker "think[s] or . . . feel[s] that there is something wrong … going on," not every time a worker is unable to make contact with a client.  (*Id.* ¶¶ 69-71.)

Plaintiff was expected to help clients obtain public government benefits, as well as reparation benefits provided through the Conference on Jewish Material Claims Against Germany.  (*Id.* ¶¶ 11,

73.)  The procedures for obtaining such benefits are often time sensitive, requiring contact with the client and third-party sources.  (*Id.* ¶¶ 74-76.)

Plaintiff was required to participate in one of three monthly "coffee houses," which are social events that provided food, music, and social interaction to the clients.  (*Id.* ¶ 77.)  His responsibilities for each coffee house were to notify and invite his clients, arrive early to assist with set-up, and interact with clients during the event.  (*Id.* ¶ 78.)  Plaintiff was also assigned to give a short informational speech to clients at each of the coffee houses he attended, usually around the mealtime portion of the event.  (*Id.* ¶ 79.)  Advance planning for these events involved ascertaining the number of attendees so that the proper amount of food could be ordered, and appropriate car service transportation could be arranged.  (*Id.* ¶ 80.)  Musicians for the coffee houses were also "booked months in advance" and RHSP "rotates through multiple musicians so the clients get some variety."  (*Id.* ¶ 82.)

Case notes needed to be completed correctly.  "[E]very visit, contact, or communication with the client or with someone else relating to the client must be documented properly in a case note."  (*Id.* ¶ 86.)  Case notes were also required to be recorded as soon as possible after the event on which it is based occurred.  (*Id.* ¶ 90.)  With regard to content, cases notes must be "precise, objective and factual," without "subjective, impressionistic or judgmental language."  (*Id.* ¶ 92.)  Plaintiff contends that he was only required to make case notes based on interactions with the client, not with others about the client (*id.* ¶ 88) and that only "important" events need to be recorded (*id.* ¶ 89).  He also contends that the timing of the case notes is dependent on many factors, such as how busy the worker is (*id.* ¶ 91), and that the content of the case notes was left totally to the discretion of the social worker, although they needed to be clear, concise, understandable, non-judgmental, and sufficient to track the provision of services to the client (*id.* ¶ 93).

## II.     Plaintiff's Allegations of Religious Discrimination

Plaintiff alleges that he was treated differently on the basis of his religion and was subjected to discriminatory acts and statements.

### A.     *Disparate Treatment*

Plaintiff alleges various ways in which he was treated differently from his co-workers.

Plaintiff claims that he was required to have supervisory sessions with Woolley which were lengthier than his co-workers'. (*Id.* ¶¶ 143-46.) He did not believe that the length of the supervisory sessions was related to his age or religion. (*Id.* ¶ 147.) These meetings were also held with the office door closed, which he claims violated the religious prohibition of seclusion (yichud). (Aff. ¶¶ 27-28.) Plaintiff alleges that this violated a best practice standard of the National Association of Social Workers, which emphasizes that supervisors should develop knowledge about the culture of those they supervise. (*Id.* ¶ 28.) He also alleges that this practice came about or increased after he raised concerns about diversity and cultural issues. In his Affirmation, he states, "When I brought to Ms. Woolley'[s] attention diversity and cultural issues, my supervision sessions became lengthier and mostly behind closed doors, even after I informed Ms. Woolley that it created the issue of yichud (prohibition of seclusion)." (Aff. ¶ 27)

Woolley required Plaintiff to copy her on all his emails, which he believed was not required of other workers or part of his job description. (Defs.' 56.1 ¶ 148; OG Dep. at 183:5-6.) Additionally, he claims that he spoke with another social worker and Orthodox Jew, Larisa Tsekhanskaya, who also said that she did not have to copy her supervisor on her emails. (Defs.' 56.1 ¶ 152; OG Dep. at 184:12-24.) Woolley had a general policy of requiring that workers copy her on any client email sent out. (Defs.' 56.1 ¶ 155.) Plaintiff also believed this requirement "could be part of retaliation," but the instruction was given before he sent the "fresh look" emails (discussed *infra*). (OG Dep. at 190:11-191:24.)

### B.    Discriminatory Acts

Plaintiff claims that Defendants engaged in conduct that either directly discriminated against him, or that support an inference of discriminatory intent in their later termination of him.

At the beginning of September or end of August, there was an "end of summer" party for RHSP staff, organized by Khachatryan to which staff members brought food.  No one volunteered to bring kosher food, so Plaintiff believed he needed to bring something kosher so he could participate.  Although one person was responsible for buying food using money contributed by other staff members, Plaintiff did not speak to that person about purchasing some kosher food.  (Defs.' 56.1 ¶¶ 158-61.)  According to Plaintiff, "Khachatryan responded [to an email] that she couldn't care less about food choices including my kosher choice ridiculing my kashrut observance and making me bring my food."  (Aff. ¶ 92.)

Defendants allowed an Orthodox Rabbi "to give a lecture about meaning and traditions of High Holidays," even though Woolley considered Plaintiff's holding of the four species on Sukkot, *see infra*, to be an "explicitly religious activity."  (Aff. ¶ 61.)

In or about September 2017, Plaintiff requested time off for the Jewish holidays.  (Defs.' 56.1 ¶ 97.)  Woolley informed him that Selfhelp already gave its employees Rosh Hashanah and Yom Kippur off, but Plaintiff needed time off for additional Jewish holidays around that time.  (*Id.* ¶ 97.)  Plaintiff states that Woolley acceded to his "request only after [he] repeatedly said that [he] was not allowed to work on Jewish holidays, and she left [Plaintiff] no choice but to quit [his] job."  (Aff. ¶ 96; *see also* Defs.' 56.1 ¶ 98; OG Dep. at 230:14-25.)

Plaintiff alleges while he "was out of the office for a religious observance" on October 12 and 13, 2017, Woolley "bull[ied]" him on October 12 and 13, 2017 when she "called [his] clients for the purpose of soliciting complaints with the intention to damage [his] reputation."  (Aff. ¶ 67.)

On an unspecified date, Woolley sold Plaintiff a bottle of kosher wine given to one of the social workers by a client because she knew he was kosher and thought he might be interested in it. Plaintiff purchased it for approximately three to five dollars.  (Defs.' 56.1 ¶ 163.)  Plaintiff said that he "paid whatever price [Woolley] told him" "[t]o avoid embarrassment and humiliation in front of his coworkers."  (Pl.'s 56.1 ¶ 163.)

### C.  Discriminatory Statements

Plaintiff claims that various employees of Defendants made comments to him that were "harassing" or discriminatory.  He also perceived some of these statements as indicating cultural insensitivity toward clients.

For her birthday, Woolley held a birthday lunch party for employees at a non-kosher restaurant; as a result, Plaintiff could not attend.  (Defs.' 56.1 ¶ 166.)  Plaintiff was told by a co-worker that "his values of kashrut observance were ridiculed at this party," and that people criticized him for not attending.  (Id. ¶ 167.)

At some time, Woolley told Plaintiff that they serve kosher food at client social events because the events take place in a Jewish center.  Plaintiff felt that this was an expression of anti-Jewish feelings because she was generalizing about all clients.  (Id. ¶ 171; OG Dep. at 278:22-279:18, 280:20-282:15.)

On unspecified dates, Plaintiff heard co-workers make negative comments about not liking kosher food.  (OG Dep. at 220:7-22.)  Plaintiff did not complain to anyone about these comments.  (Id.)

Plaintiff heard a co-worker say, "They get divorced to get more benefits," and "They used to complain in the Soviet Union.  Now they complain here."  (Defs.' 56.1 ¶¶ 172-74.)  Plaintiff does not know who was referenced in these comments.  (OG Dep. at 287:16-288:12.)  The same co-worker also said to an intern that Jews cheat on their wives because they are always pregnant, and that

Orthodox Jews go to Russian bathhouses and stare at women.  (Defs.' 56.1 ¶ 175.)  Plaintiff did not report these comments to anyone at Selfhelp.  (*Id.* ¶ 176; OG Dep. at 294:24-295:11.)

Plaintiff states that his co-worker Tsekhanskaya told him that Khachatryan said descendants of Holocaust survivors are not entitled to anything.  (*Id.* ¶ 178.)  Khachatryan does not deny making that comment but explained that it was pursuant to a rule on German reparations which only entitled survivors, not their descendants, to benefits.  (*Id.* ¶¶ 179-80.)

In late September, Khachatryan made various statements that Plaintiff perceived as "portraying all Jews in negative ways" and "exhibit[ing] unconscious biases affecting her judgment." (Aff. ¶ 39.)  After stating, "I am not Jewish" (Defs.' 56.1 ¶ 198), she stated that Jews lost their faith after the Holocaust.  (*Id.* ¶ 200.)  She relayed a story about how at an event, a client passed out, but other clients continued to eat.  (*Id.* ¶ 204.)  She stated that clients did not even know what Tu Bishvat (the new year of trees) was.  (*Id.* ¶ 208.)  She said that clients eat pork.  (*Id.* ¶ 211.)

Khachatryan explained that she has learned that many Jewish Holocaust survivors did indeed lose their faith, especially those who lived in the former Soviet Union, because they were not permitted to learn about or practice Judaism.  (*Id.* ¶ 203.)  She relayed the story about the client passing out to illustrate how the coffee houses are meant to allow clients to relax without being concerned with the problems of others.  (*Id.* ¶ 207.)  With her statement about not knowing about Tu Bishvat, Khachatryan explained that she was trying to convey that many clients are not observant and are sometimes surprised to learn of certain holidays.  (*Id.* ¶ 210.)  Finally, Khachatryan explained that many clients do eat pork, and workers must be sensitive to different levels of religious observance. (*Id.* ¶ 213.)

Plaintiff did not complain to anyone at Defendants about any of these comments by co-workers or supervisors, or of conduct toward him that he found discriminatory.  (*Id.* ¶ 235.)  He testified, "I did not feel comfortable to complain about everything.  So I complained about major

issues that I thought would be helpful to improve the program in general, not the things that concerned myself." (OG Dep. at 221:3-7.) He explained that he was concerned he "could jeopardize my employment . . . . Because I had a bad experience ten years before" at a different job. (*Id.* 257:3-17.) He also stated, "People don't like complainers." (*Id.* at 257:16-17; Defs.' 56.1 ¶ 235.)

III.   **Plaintiff's Allegations of Protected Activity**

A.   *Advocacy for Different Music*

When Plaintiff learned that Inessa Matevosyan, the case worker in charge of selecting musicians for the coffee houses, was seeking musicians to perform Hebrew and Israeli songs, Plaintiff suggested a musician named Mendy Wax. (Aff. ¶ 32.) Although Woolley "admitted that he 'plays beautiful and has a nice voice,'" Plaintiff claims that she rejected him "after she obviously noticed that on provided sample video clips Mr. Wax was dressed as an Orthodox Jew." (*Id.* ¶ 33.)

Woolley had put Plaintiff "in charge of information and education" at the coffee houses. (*Id.* ¶ 34.) At the September 14, 2017 coffee house, the performing musician was late, nervous, and played "old gypsy songs and he was using existing audio recordings." (*Id.* ¶ 35.) Plaintiff thereafter wrote an email dated September 25, 2017, to Woolley and Khachatryan with the subject line "a fresh look at music for CH." (Khachatryan Aff. Ex. V, "Sept. Email," at 2.) In it, Plaintiff wrote, "gypsy music is not the best choice for Rosh Hashanah or upcoming Sukkot." (*Id.*) He indicated that he had spoken to Mateyosyan, who "doesn't seem to be sensitive to this matter." (*Id.*; *see also* Aff. ¶ 32.)

Woolley responded by email, stating, "We haven't heard any complain[t]s from clients about the music for Coffee Houses," and telling Plaintiff that if he comes across any such complaints, he should refer them to a supervisor or director. (Sept. Email at 2.) Plaintiff replied within minutes, stating that "it's not about complain[t]s—it's about cultural sensitivity and choices…" (*Id.* at 1 (ellipses in original).) Woolley responded again, stating, "The music was in Russian, clients understood the words, related to music and were able to dance. About the choice—there are different singers

performing at different CH. Clients always have variety." (*Id.*) Plaintiff wrote back, "Rosh Hashanah is not about dance or words in Russian, it's about meaning and beginning. . . . Upcoming Sukkot is a time of rejoicing and it might be appropriate to invite someone who performs Jewish music—Israeli, Hassidi etc. By the way, we have many observant clients who would only appreciate it." (*Id.*)

Two days later, during his supervision session with Woolley, Plaintiff again raised the issue of using different musicians. (Defs.' 56.1 ¶ 195.) Because Plaintiff "continued to press the point so hard," Woolley suggested they go to Khachatryan's office to discuss the issue with her. (*Id.* ¶ 196.) Khachatryan expressed appreciation for Plaintiff's concern for the clients' spiritual well-being but explained that the issue Plaintiff raised was not a problem. However, "Plaintiff continued to argue that they were being religiously and culturally insensitive to the clients and that 'gypsies' should not be singing to clients around significant Jewish holidays." (*Id.* ¶ 197.)

At one point during the meeting, after Woolley had left, Plaintiff and Khachatryan continued talking. Khachatryan made the statements described above at Section II.C.

B.   *Advocacy for Observance of Traditions*

Plaintiff took issue with what he perceived to be insensitivity and discrimination toward observant clients in the scheduling of trips. "Indeed, many trips were scheduled close to Jewish holidays when observant clients couldn't attend." (Compl. ¶ 15.) "Scheduling trips on Shabbat or holidays when they cannot participate is not only culturally insensitive, but also discriminatory." (Aff. ¶ 23.)

In or around the second week of October, Plaintiff wanted to share information about the "four species"—plants associated with the holiday of Sukkot—at a coffee house. (*Id.* ¶ 218.) He began to go from table to table, speaking with each client individually about the meaning of Sukkot, and presenting them with the four species to hold. (*Id.*) Woolley followed Plaintiff and "seemed to be very upset." (*Id.* ¶ 220.) Plaintiff believed she was recording him on her cellphone, although he

could not see what was on her phone and he did not ask if she was recording.  (*Id.*)  According to Defendants, allowing Plaintiff to continue with each client in this way "would have thrown the coffee house way off schedule."  (*Id.* ¶ 221.)  Woolley told Plaintiff he was not supposed to do what he was doing, and when asked why, she told him that the clients were "not traditional."  (*Id.* ¶ 224.)  She told Plaintiff that instead of approaching each client individually, he should go to the microphone and tell all the clients at once about the four species and Sukkot.  Plaintiff did so.  (*Id.* ¶ 225.)  He did not invite clients at the end of the presentation to approach and hold the four species because he felt his supervisor had prohibited it.  He did not ask if he could make that offer.  (*Id.* ¶ 227.)

### C.   *Advocacy Relating to Keeping Kosher*

Plaintiff claims that Defendants' case workers "were not instructed on how to handle kosher food delivery, Jewish holidays, grief/loss/bereavement questions clients asked," and Woolley failed to develop a referral partnership to provide kosher food delivery.  (Aff. ¶ 24.)  He also claims he discussed with Khachatryan an issue he observed with staff not using the proper utensils to ensure full observance of the laws of kashrut (keeping kosher), but that he did not "feel that she was going to make any changes."  (Defs.' 56.1 ¶ 121.)  Defendants maintain that one of the other RHSP workers, who is an Orthodox Jew, was already assigned to ensuring that the kitchen was maintained in a kosher manner.  (*Id.* ¶ 122.)[1]

### IV.   **Plaintiff's Performance Issues**

Plaintiff described his first two months of work as a "honeymoon" during which he was praised for "doing a great job."  (Aff. ¶ 21; Defs.' 56.1 ¶¶ 19-21, 139; *see also* Compl. ¶ 7.)

---

[1] Plaintiff took issue with other instances of what he perceived to be insensitivity and discrimination toward observant clients, for example, in the scheduling of trips.  "Indeed, many trips were scheduled close to Jewish holidays when observant clients couldn't attend." (Compl. 15.)  "Scheduling trips on Shabbat or holidays when they cannot participate is not only culturally insensitive, but also discriminatory." (Aff. ¶ 23.)  However, he does not present evidence that he raised these concerns with Defendants, as he did with other matters.

Toward the end of September and early October, Woolley received several complaints from clients and clients' family members about Plaintiff. (Defs.' 56.1 ¶ 123.) These included complaints that Plaintiff refused to take an application for hearing aids from a client at the coffee house on October 12, 2017, that Plaintiff had not invited some clients to several coffee houses, that he failed to show up for scheduled home visits, that he failed to assist a client with an issue with the utility company despite her request, that he asked a client to call him back after the holidays in response to her request for assistance in getting grab bars in her bathroom, and that he had prepared an incomplete benefits application for a client which resulted in a delay in her receipt of services. Plaintiff's case notes reflected information other than what the clients alleged. In addition, several clients also complained that they lacked emotional connection and care from Plaintiff. (*Id.*) The number of complaints against Plaintiff was greater than for the average worker, and because they occurred within a relatively short amount of time, and "there was a common thread" among them, this raised a "red flag" for Khachatryan. (*Id.* ¶ 125.)

Woolley decided in or about the end of September to perform an audit of Plaintiff's client files and case notes "to better evaluate his compliance with work standards." (*Id.* ¶ 126.) She discovered "many significant performance problems." (*Id.* ¶ 127.) On October 3, 2017, Woolley met with Plaintiff to discuss these issues and "counsel him on his immediate required improvement." (*Id.* ¶ 128.)

The content of that discussion was memorialized in an email, which Woolley sent on October 4. (*Id.* ¶ 129; Khachatryan Aff. Ex. U at 2.) It highlights the "major issues" Woolley identified, including that: 17 of Plaintiff's 42 assigned clients did not receive any communications from him in September, and 25 of them did not receive any home visits during the past two months; one client did not have any contact with Plaintiff since July; Plaintiff failed to inform management or take other action on two cases that were "missing for the past three months"; three emergency situations with

clients had not been addressed; Plaintiff failed to discuss case management with several clients when he called to invite them to coffee houses; Plaintiff's case notes failed to contain sufficient information about his interactions with clients and did not include his assessment, observations, and client's needs. (Khachatryan Aff. Ex. U at 2.) Woolley included the names of some of these clients in the email.  (*Id.*)

Woolley's email also detailed actions she expected Plaintiff to take by specific dates.  These included that he contact two missing cases and report to Woolley by October 6; that he contact all clients he had not contacted in September and report to Woolley by October 13; and that he make the required 15-20 home visits for October.  (*Id.*)  Woolley indicated that the next review of his caseload would be conducted in the first week of November 2017.  (*Id.*)  She also summarized some "Office case management standards" that Plaintiff was required to follow.  (*Id.*)

Plaintiff responded that same day by email, stating that he is "striving to improve."  (*Id.* at 1.) He wrote, "Perhaps, you can be more specific and give me names of clients you found major issues with three month[s] later after having me on board and shortly after my 'fresh look' email about cultural sensitivity."  (*Id.*)  He then provided explanations for failing to take action on the three emergency cases, including that some clients' refusal to use some services "may also have a cultural aspect as people who lived under the authority of an oppressive Soviet Union government might see [the service] workers as authority agents who have significant power to control their lives and negatively impact their quality of care."  (*Id.*)

Plaintiff claims that although Woolley had "never addressed any minor deficiency during weekly supervisory meetings, [she] suddenly found 'major issues' in my performance blaming me for following RHSP policies prohibiting blind home visits" and refusing to make referrals for assistance without client consent.  (Aff. ¶ 47.)  He characterized the timing of Woolley's email as "suspicious." (*Id.* ¶ 48.)

Plaintiff's case notes show that Plaintiff only called one of the two missing clients, and Woolley had to call the other client herself on October 10. (Khachatryan Aff. Ex. Q at D002197, D002212, D002255, D002256; Defs.' 56.1 ¶ 136.) Plaintiff also did not call at least one of the "inactive" clients, that is, those who had not been contacted in September, by October 13, as instructed. (Khachatryan Aff. Ex. Q at D002213-; Defs.' 56.1 ¶ 137.) Plaintiff's cases notes reflected that, as of October 16, Plaintiff had conducted only seven home visits, and had not set up or conducted home visits for 21 clients. (Khachatryan Aff. Ex. Q at D002199, D002206, D00216, D002225, D002227, D002239; Defs.' 56.1 ¶ 138.)

Defendants submitted Plaintiff's case notes on all his clients.[2] (Khachatryan Aff. Ex. Q.) They show that he did not make, or attempt to make, monthly contact with many of his clients; when he was unable to reach them, he did not notify management as required. (Defs.' 56.1 ¶¶ 101-02.) As of October 3, 2017, Plaintiff had failed to make home visits to approximately 29 of his clients. (*Id.* ¶¶ 103-04; Khachatryan Aff. Ex. Q.)[3] Plaintiff's case notes also show that clients left telephone messages for Plaintiff on nine occasions, but he failed to return their calls. (Defs.' 56.1 ¶¶ 105-07.) There were also eight instances of client requests or emergency situations which were not timely addressed. (*Id.* ¶ 108.) These included requests for assistance to file an appeal of a denial of benefits, obtain increased home care hours, order medical supplies, and apply for Access-A-Ride transportation services. (*Id.*) Several of Plaintiff's case notes failed to provide substantive information about the client, stating only that he called the client and what he attempted to do, but nothing about the client's status or response. (*Id.* ¶ 109-10.) Finally, the case notes show that Plaintiff failed to place "even a single call" to 23 of

---

[2] For privacy reasons, their names were redacted and only initials were used.

[3] The notes in Exhibit Q to the Khachatryan Affidavit indicate that Plaintiff visited the clients listed in paragraphs 104(j) and 104(*l*) of Defendants' 56.1. (*Compare* Khachatryan Aff. Ex. Q *with* Defs.' 56.1 ¶¶ 104(j), 104(*l*).

his clients to invite them to a coffee house, and two clients complained to Woolley that they were not called even though Plaintiff's case notes indicate that he called them.  (*Id.* ¶ 112-13.)

Plaintiff frequently arrived late to coffee houses and left early, despite being told this was unacceptable.  (*Id.* ¶¶ 114-17.)  During the coffee houses, he often stayed in the kitchen instead of mingling with clients in the main room, even after food had been distributed to the clients.  (*Id.* ¶ 119.)  In the kitchen, Plaintiff "took it upon himself to monitor and oversee the food apportionment process, to ensure that the laws of kashrut [keeping kosher] were fully observed," claiming that kitchen staff had not been properly instructed in proper use of "meat" and "dairy" utensils.  (*Id.* ¶ 120.)

## V.     Plaintiff's Termination

On October 13, Woolley sent a completed disciplinary action form for Plaintiff to Kevin Byrne ("Byrne"), Vice President of Human Resources and Labor Relations at Selfhelp, for his review and advice.  (*Id.* ¶ 239.)  Byrne noted that Plaintiff was still within his probationary period and asked why he was not being terminated instead of being issued a disciplinary notice.  (*Id.* ¶ 241.)  Byrne, Woolley, Khachatryan, and Managing Director of Social Services Karen DeOssie (Khachatryan's supervisor) decided to terminate Plaintiff.  (*Id.* ¶ 242; Khachatryan Aff. ¶ 11.)  The decision to terminate him was finalized "no later than end of day October 16, 2017."  (Khachatryan Aff. ¶ 95.)  By the time Khachatryan went to work on the morning of October 17, she had already planned to hold the termination meeting with Plaintiff that day.  (*Id.*; Defs.' 56.1 ¶ 243.)

At 10:15 am on October 17, 2017, Plaintiff sent an email to Woolley with a cc to Khachatryan, with the subject line, "a fresh look on a sw [social worker] supervision."  (Khachatryan Aff. Ex. X.)  In it, he stated that he "value[s] constructive criticism" but took issue with Woolley's case note in a client file, which indicated that when Woolley contacted the client to "ask about his well-being" after the coffee house on October 12, 2017, the client stated that he had brought the copy of a hearing aid application to the coffee house to pass to Plaintiff, "who didn't take it from [him]."  (*Id.*)  He explained

that it was not clear that the client had recovered from an ear infection and was ready to proceed with the hearing aid. He also complained that the description "creates unnecessary tension between" the client and social worker. He further stated that he "was confused when you called arba minim (four plants) which I have brought and which were relevant to the holiday of Sukkot 'not a part of tradition.'" (*Id.*) Plaintiff noted that after he "spoke about these plants in the microphone," the clients clapped—"it seemed to be well tolerated." (*Id.*)

In the middle of the day on October 17, 2017, Khachatryan called Plaintiff into her office. (Defs.' 56.1 ¶ 245.) Woolley was present but did not speak. (*Id.* ¶ 246-47.) Khachatryan informed Plaintiff that they had decided to terminate him, and that he was still in his probationary period. (*Id.* ¶ 248.) When asked the reason for his termination, Khachatryan told him that he was not a good fit for the program, and she also mentioned that he did not do a sufficient number of home visits. (*Id.* ¶ 250.) Nobody said anything about Plaintiff's age or religion during this meeting. (*Id.* ¶ 256.) The Personnel Action Form for Plaintiff notes the reason for Plaintiff's termination as "did not pass orientation period." (*Id.* ¶ 257.)

Plaintiff claims that Defendants violated its progressive discipline policy. (Aff. ¶ 51.) According to Defendants, Plaintiff was still within his six-month probationary period, since a recent change to a three-month probationary period did not apply retroactively. (Defs.' 56.1 ¶ 48.)

## VI. Post-Termination Contacts Between Plaintiff and Defendants

In November 2017, Plaintiff requested to meet with Byrne to ask about the basis for his termination. (*Id.* ¶ 261; *see also* Compl ¶ 26.) During the meeting, Plaintiff asked Byrne if he was Jewish. When Byrne replied that he was not, Plaintiff stated that RHSP would benefit from "having Jewish employees who would understand the clients better than anyone else." (Defs.' 56.1 ¶ 264.) Byrne stated that he disagreed. (*Id.*) Plaintiff believes it is discriminatory for Byrne to have that opinion. (*Id.* ¶ 265.)

## VII.    Allegations of Age Discrimination

Plaintiff observed that he and Tsekhanskaya were terminated within a short time of each other, and that shortly before his termination, two "younger" employees were hired.   (*Id.* ¶ 181.) Tsekhanskaya was hired and fired within a month or two of her hire.  (*Id.* ¶ 184.)  She and Plaintiff had different supervisors.  (*Id.* ¶ 186.)

*        *        *

Plaintiff filed a complaint with the Equal Employment Opportunity Commission in March 2018, and on May 15, 2018, received a right to sue letter.  (Compl. at 6.)

## PROCEDURAL HISTORY

Plaintiff, who is acting *pro se*, filed the Complaint on August 1, 2018.  (Dkt. 1.)  He asserts that Defendants retaliated against him in violation of Title VII and the NYCHRL.  He also claims that Defendants discriminated against him on the basis of his religion in violation of Title VII and the NYCHRL, and on the basis of his age in violation of the ADEA and the NYCHRL.  (*See id.*) Defendants filed their Answer on September 14, 2018.  (Dkt. 10.)

At the conclusion of discovery, Defendants filed the Motion, including their Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Mem. in Supp.," Dkt. 38-58). Plaintiff filed his opposition, consisting only of his Affirmation (Dkt. 43) and Rule 56.1 Counterstatement, without a memorandum of law.  Defendants filed a Reply Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment ("Reply," Dkt. 46).  Defendants contend that Plaintiff is not in compliance with the rule requiring that motion papers include a memorandum of law (*see* Reply at 1, 4-5); however, in light of Plaintiff's *pro se* status, the undersigned excuses this deficiency.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment and partial summary judgment.   Rule 56(a) states:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—for which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

"In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quotations and citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A "dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"A district court may not grant a motion for summary judgment in a case involving a *pro se* litigant unless: (1) the court apprises the *pro se* litigant of the consequences of failing to respond to the motion; (2) an opposing party has already provided the litigant with the requisite notice; or (3) it is clear that the litigant understands the nature and consequences of a summary judgment motion." *Arum v. Miller*, 304 F. Supp. 2d 344, 348 (E.D.N.Y. 2003) (quotation and citation omitted).  Local Civil Rule 56.2 sets forth the contents of the "requisite notice," which must be entitled, "'Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment.'"  The Rule also requires the moving party to provide the *pro se* litigant "with the full texts of Fed. R. Civ. P. 56 and Local Civil Rule 56.1" and to file a copy of the documents served on the *pro se* party "as a separate document, together with the papers in support of the motion."  Local Civ. R. 56.2.

A *pro se* litigant's "'submissions,'" including those submitted in opposition to a motion for summary judgment, "'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Smith v. Cty. of Nassau*, No. 12-CV-4344 (SJF)(GRB), 2014 WL 2862849, at *3 (E.D.N.Y. June 18, 2014) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). "Nevertheless, the 'application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Id.* (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)).

## DISCUSSION

All of Plaintiff's claims are analyzed pursuant to the burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Dillon v. Ned Mgmt., Inc.*, 85 F. Supp. 3d 639, 659, 661 (E.D.N.Y. 2015) (applying the *McDonnell Douglas* framework to plaintiff's Title VII and NYCHR retaliation claims); *Missick v. City of New York*, 707 F. Supp. 2d 336, 347 (E.D.N.Y. 2010) (Title VII, ADEA, and NYCHRL disparate treatment claims each analyzed pursuant to the burden-shifting framework in *McDonnell Douglas*).

"At the first stage, the plaintiff bears the burden of establishing a 'prima facie' case." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012) (citing *Tex. Dep't of Cmty. Affs. V. Burdine*, 450 U.S. 248, 252-53 (1981)). "The requirements to establish a prima facie case are 'minimal.'" *Id.* (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

If Plaintiff can establish a *prima facie* case, "the burden then falls upon the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Missick*, 707 F. Supp. 2d at 347 (citation omitted). "The defendant satisfies this burden if the reason given 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Id.* (quoting *Hicks*, 509 U.S. at 509). "If the defendant satisfies [this] burden of production, then the

presumption raised by the prima facie case is rebutted and drops from the case." *Bucalo*, 691 F.3d at 129 (quotation and citation omitted).

At the final stage, the burden shifts back to the plaintiff to "allege evidence that suggests that it is more likely than not the case that the reasons offered are mere pretext designed to cover up the employer's actual discriminatory intent." *Missick*, 707 F. Supp. 2d at 347 (citing *Ferrell v. Leake & Watts Servs., Inc.*, 83 F. App'x 342, 346 (2d Cir. 2003)).

## I.      Procedural Compliance

In compliance with Local Civil Rule 56.2, Defendants served on Plaintiff and then filed a Notice to Pro Se Litigant Who Opposed a Motion for Summary Judgment, together with copies of Rule 56 and Local Civil Rule 56.1.  (Dkt. 38-59.)

## II.     Jurisdiction

Jurisdiction over Plaintiff's federal claims is proper pursuant to 28 U.S.C. § 1331.  Jurisdiction over Plaintiff's NYCHRL claims is proper pursuant to 28 U.S.C. § 1367.

## III.    Plaintiff's Retaliation Claims

### A.      *Title VII Retaliation Claim*

#### 1.      **Whether Plaintiff Established a *Prima Facie* Case**

To establish a *prima facie* case in a Title VII retaliation claim, "the plaintiff must show: (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir. 2001).

It is undisputed that Plaintiff's termination constituted an adverse employment action.  The only issues, then, are whether Plaintiff engaged in a protected activity; if he did, whether Defendants knew of it; and, if so, whether there was a causal connection between the protected activity and his termination.

Defendants contend that Plaintiff cannot establish a *prima facie* case because the activities he engaged in—advocating on behalf of Defendants' clients—are not, as a matter of law, protected activities that can serve as the basis of a retaliation claim. (Mem. in Supp. at 22-24.) The undersigned agrees.

The actions Plaintiff describes in both the Complaint and in opposition to the Motion as constituting protected activities are confined to his raising issues of perceived cultural insensitivity toward clients, not employees. The Complaint alleges, "After [Plaintiff's] first 'fresh look' email about lack of cultural sensitivity he was blamed in accusing management of cultural insensitivity and soon after was given a poor performance review in retaliation for giving constructive criticism. Immediately after his second 'fresh look' email he was discharged for 'not fitting the program'." (Compl. at 5.) In his Affirmation, Plaintiff states that his "persistent attempts to advocate on behalf of observant clients were met with resistance and retaliation." (Aff. ¶ 26.)

In what Plaintiff calls the "first 'fresh look' email," he expressed concern about whether the "gypsy music" performed at a coffee house during Rosh Hashanah was "the best choice." (Sept. Email at 2.) He suggested that Defendants "invite someone who performs Jewish music—Israeli, Hassidic etc." (*Id.* at 1.) While Plaintiff complained that the music chosen "could not accompany and express [the] holiday's significance" (Aff. ¶ 35), and he disagreed with his supervisors about whether the clients were enjoying the music, Plaintiff never complained that Defendants' choice of music was discriminatory toward him or his co-workers based on their religion.

Plaintiff hints that his advocacy of the musician Max Wendy might constitute a form of protected activity, stating, "It is my understanding that [Woolley] was fed up with my speaking up about discrimination against the Orthodox musician, lack of diversity and cultural sensitivity towards observant clients and employees." (*Id.* ¶ 38.) However, even though he claims, without support, that Woolley rejected Wax after seeing that he "was dressed as an Orthodox Jew" (*Id.* ¶ 33), Plaintiff made

no complaint in his emails or subsequent discussions that could be considered a complaint of a discriminatory hiring practice. Plaintiff also does not claim that Wax ever applied for employment with Defendants. *See Gaffney v. Dep't of Info. Tech. & Telecomms.*, 536 F. Supp. 2d 445, 459-60 (S.D.N.Y. 2008) ("As part of plaintiffs' *prima facie* cases in failure to hire claims, courts generally require that the plaintiff establish that she applied for the specific position but did not receive an offer.").

The email sent the same day as his termination, which Plaintiff calls the "second 'fresh look' email," also centered on disagreements over cultural sensitivity toward clients, not a complaint of employment discrimination. In the email, Plaintiff described Woolley's "harassment" of him during the Sukkot coffee house when he went from table to table with the "four species." (Aff. ¶¶ 53-55, 66; *see also* Defs.' 56.1 ¶¶ 217, 242-245.) Plaintiff "believe[s]" that this email "triggered [his] immediate termination." (Aff. ¶ 70.) However, the email did not raise any complaint of discriminatory treatment of Plaintiff or other employees based on their religion. Plaintiff described Woolley's "harassment" as an attempt to stop him from teaching the clients about an important tradition. (Aff. ¶ 56.) However, Plaintiff admits that Woolley permitted him to instruct the attendees on the meaning and significance of the four species at the microphone rather than at individual tables. (Defs.' 56.1 ¶ 225.) Plaintiff made no complaint that his supervisor's behavior was discriminatory. (OG Dep. at 274:7-275:3; Aff. ¶ 55.)

In short, Plaintiff believed that Defendants were not adequately meeting their clients' religious needs and he advocated to his supervisors on their behalf as he believed a social worker should. (*See* Aff. ¶¶ 25-26.) Such actions are not protected activities under Title VII because "Title VII does not reach the business relationship that exist[s] between [Defendants] and [their clients]; it prohibits only discrimination of employees." *Kunzler v. Canon, USA, Inc.*, 257 F. Supp. 2d 574, 582 (E.D.N.Y. 2003); *see also Petrisch v. HSBC Bank USA, Inc.*, No. 7-CV-3303 (KAM)(JMA), 2013 WL 1316712, at *19

(E.D.N.Y. Mar. 28, 2013); *Foxworth v. Am. Bible Soc.*, No. 3-CV-3005 (MBM), 2005 WL 1837504, at *4 (S.D.N.Y. July 28, 2005).

Plaintiff describes instances of potentially discriminatory conduct by Defendants toward him, but he never made any complaints about such discriminatory behavior to his employer.  Plaintiff admits that he did not advocate on behalf of himself or Defendants' other employees.  Although Plaintiff states that Woolley "was fed up with [his] speaking up about . . . cultural sensitivity towards . . . employees" (Aff ¶ 38), Plaintiff does not give any examples of Defendants' lack of cultural sensitivity towards himself or other other employees.

In fact, Plaintiff testified at various points in his deposition that he did not complain, explaining that he was afraid of losing his job.  (*See* OG Dep. at 221:3-7, 257:3-17; *see also* Defs.' 56.1 ¶ 235.)  There is also no evidence that he filed a complaint with any outside agency prior to his termination.

Without a complaint of discrimination toward himself or his co-workers, or other actions that could constitute protected activity, Plaintiff cannot establish a prima facie case of retaliation.

   2.   **Whether Defendants Set Forth Legitimate, Non-Discriminatory Reasons for Plaintiff's Discharge**

Assuming, arguendo, that Plaintiff established a *prima facie* case of retaliation, the second step in the inquiry is to examine whether Defendants have set forth legitimate, non-discriminatory reasons for Plaintiff's discharge.

There is no dispute that throughout the course of his employment, Plaintiff was within the six-month probationary period for all of Defendants' new hires.  (*See* Defs.' 56.1 ¶¶ 48, 49, 244; Pl.'s 56.1 ¶¶ 48, 49, 244.)

Defendants maintain that Plaintiff's performance during this time was "severely poor."  (Mem. in Supp. at 16.)  According to Defendants, by the beginning of December, they "received more complaints [about Plaintiff] than the average worker, within a relatively short period of time, and there

23

was a common thread to those complaints, which sent up a red flag about Plaintiff's performance." (Defs.' 56.1 ¶ 125.)  As a result of these comments, Woolley audited Plaintiff's client files and case notes and "discovered many significant performance problems." (*Id.* ¶¶ 126-27.)  Woolley met with Plaintiff on October 3, 2017 to discuss his performance issues and set forth areas of required improvement. (*Id.* ¶ 128.)  Woolley memorialized this discussion in an October 4, 2017 email she sent to Plaintiff. (*Id.* ¶ 130.)  The email also set forth certain dates by which Plaintiff had to meet specific goals. (Khachatryan Aff. Ex. U at 2; *see also* Defs.' 56.1 ¶ 129.)  Plaintiff did not meet many of these deadlines. (*See* Defs.' 56.1 ¶¶ 136-38.)

Plaintiff does not dispute that Defendants had policies and procedures but maintains that they were often inconsistent and not clearly defined. (*See, e.g.*, Pl.'s 56.1 ¶¶ 58, 62, 66, 70.)  Plaintiff disputes being aware of the complaints Defendants' clients made about his performance. (*Id.* ¶ 125.)  He also disputes what he discussed with Woolley on October 3, stating that "[n]o performance issues or complaints from clients were mentioned during that meeting." (*Id.* ¶ 128.)  Instead, Woolley "inform[ed Plaintiff] that he passed an orientation period and was intitled [*sic*] to work independently." (*Id.*)  However, Plaintiff does not dispute receiving the October 4, 2017 email, the contents of that email, or that he failed to comply with the deadlines set forth therein. (*Id.* ¶¶ 102, 130, 136-38.)

It is well-settled that performance issues, including failure to comply with an employer's policies and procedures, are a legitimate, non-discriminatory reason to terminate an employee. *See, e.g.*, *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985) ("Indeed, the overwhelming evidentiary presentation provided an ample basis for a trier of fact to find that [plaintiff's] discharge was based not upon a discriminatory animus, but rather upon an honest belief that her job performance simply did not measure up to that required of probationary employees."); *Missick*, 707 F. Supp. 2d at 349 (allegations of violating defendant's policies on several occasion, including its recordkeeping

requirements, "generat[e] an adequate, independent, and nondiscriminatory ground for disciplinary action").

Even drawing all reasonable inferences in Plaintiff's favor, Defendants have still put forward a nondiscriminatory explanation for his termination.  There is no dispute that Plaintiff received an email on October 4, 2017 setting forth certain actions that he had to take by set deadlines.  There is also no dispute that Plaintiff did not meet those deadlines.  That Plaintiff initially found some of Defendants' policies and procedures to be unclear does not change this conclusion, as Plaintiff has offered no evidence to suggest that he found any of the performance goals set forth in the October 4 email to be similarly unclear.

Accordingly, the undersigned finds that there is no genuine dispute that Defendants set forth legitimate, nondiscriminatory reasons for firing Plaintiff.  *See Timberlake v. N.Y. Presbyterian Hosp.*, No. 5-CV-5616 (LAP), 2009 WL 3122580, at *4 (S.D.N.Y. Sept. 29, 2009) (defendant entitled to summary judgment where plaintiff admitted valid, nondiscriminatory reasons for termination).

### 3.  **Whether Plaintiff Has Established that Defendants' Reasons for Discharge Were Pretextual**

Once Defendants set forth legitimate, nondiscriminatory reasons for terminating Plaintiff, "the presumption of [retaliation] falls away, and summary judgment for [Defendants] is appropriate unless [Plaintiff] can point to evidence that reasonably supports a finding of prohibited discrimination." *Alejandro v. N.Y.C. Dep't of Educ.*, No. 15-CV-3346 (AJN), 2017 WL 1215756, at *14 (Mar. 31, 2017) (quotations and citation omitted).  Plaintiff must show that his "'protected activity was a but-for cause of the alleged adverse action by [Defendants].'" *Sanderson v. N.Y. State Elec. & Gas Corp.*, 560 F. App'x 88, 93-94 (2d Cir. 2014) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Plaintiff does not dispute that his clients made the complaints against him that they did. (*Compare* Pl.'s 56.1¶ 123; *with* Defs.' 56.1 ¶ 123.)  "Even assuming, as the Court must at this stage, that

[Plaintiff's] version of the" events "is the correct one," that Plaintiff "does not dispute the fact that the [clients] made the complaints [Defendants] claim[ ] they did," "does nothing, by itself, to show that [Defendants'] reliance on the [client's] complaints . . . was pretext for discriminatory animus." *Mancini v. Accredo Health Grp., Inc.*, 411 F. Supp. 3d 243, 252-53 (D. Conn. 2019).

Instead, Plaintiff offers two reasons why he believes Defendants' proffered basis for his termination are pretextual.  Neither reason is sufficient to satisfy his burden.

First, Plaintiff claims that Defendants' policies and procedures differed from industry standards for social workers.  (*See, e.g.*, Pl.'s 56.1 ¶ 83 (Plaintiff's case notes met state standards for licensed social workers), ¶ 135 (Plaintiff stated that his home visits complied with "the guidance provided by [the National Association of Social Workers'] Code of Ethics").)  However, Plaintiff's belief that Defendants' policies and procedures differed from what was expected of him pursuant to industry practice does not establish that Defendants' explanation for his termination was pretextual. *See Macshane v. City of New York*, No. 6-CV-6024 (RRM)(RML), 2015 WL 1298423, at *18-19 (E.D.N.Y. Mar. 23, 2015) ("imperfect assessments" and "mistaken conclusions" do not necessarily support finding of pretext for adverse actions).  Plaintiff asks that his business judgment be substituted for Defendants', which courts must not do when evaluating retaliation claims.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) ("While we must ensure that employers do not act in a discriminatory fashion, we do not sit as a super-personnel department that reexamines an entity's business decisions." (quotation and citation omitted)).

Second, Plaintiff contends that the timing of when Defendants looked into his performance issues raises of an inference of pretext.  He states, "I believe that the decision to terminate my employment matured during the [September 27, 2017] meeting and Ms. Woolley understood Ms. Khachatryan'[s] verbal instruction that everything should be documented as a green light to find a ground for my termination." (Aff. ¶ 46.)  According to Plaintiff, "[s]everal days" after the meeting

"Woolley who was closely supervising me for several months and who had never addressed any minor deficiency during weekly supervisory meetings, suddenly found 'major issues' in my performance." (*Id.* ¶ 47.)

Plaintiff's second contention is premised on the temporal proximity between his alleged protected act and the complaints Defendants received about his performance. But, as the Second Circuit explained, "[t]he temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima face case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010).

Plaintiff does not bring forward any additional, admissible evidence to show pretext. Instead, he relies on his "belie[f]" that the decision was made during the September 27 meeting to terminate him, but he does not point to any concrete statements or actions informing that belief. Similarly, he does not state what Khachatryan's "verbal instruction" to Woolley was or why he thought Woolley understood it to be a green light to construct grounds to terminate him. Such conjecture is not sufficient to establish that Defendants were motivated by discriminatory intent. *See Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (explaining that "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment").

Accordingly, the undersigned finds that Plaintiff has not established that Defendants' reasons for firing Plaintiff are pretextual and respectfully recommends granting Defendants' Motion with respect to Plaintiff's claim for retaliation in violation of Title VII.

## B.    *NYCHRL Retaliation Claim*

The NYCHRL is interpreted" more liberally" than Title VII in the retaliation context. *See Dillon*, 85 F. Supp. 3d at 661. Specifically, "NYCHRL does not require a plaintiff to establish that she incurred an adverse employment action in order to support a retaliation claim; rather, it requires only

a showing that the event was reasonably likely to deter a person from engaging in protected activity." *Id.* (quotations omitted).

Defendants do not dispute that an adverse employment action was taken against Plaintiff (*see* Mem. in Supp. at 22-23), and the finding *supra* that there is no basis for a Title VII retaliation claim is not based on a lack of adverse employment action. Accordingly, the undersigned finds that granting summary judgment on Plaintiff's NYCHRL claim for retaliation is proper for the same reasons that it is proper on his Title VII retaliation claim. *See Mi-Kyng Cho v. Young Bin Cafe*, 42 F. Supp. 3d 495, 509 (S.D.N.Y. 2013) (holding that defendants are entitled to summary judgment on plaintiff's claim of retaliation under the NYCHRL because plaintiff's allegations did not constitute protected activities under the NYCHRL).

Furthermore, even if Plaintiff had established *prima facie* retaliation under the NYCHRL, as explained above, Defendants set forth nondiscriminatory reasons for Plaintiff's termination that he failed to show were pretextual.

Accordingly, the undersigned respectfully recommends granting Defendants' Motion with respect to Plaintiff's retaliation claim under the NYCHRL.

## IV. Plaintiff's Religious Discrimination Claims

Because the NYCHRL is broader than Title VII or the ADEA, it is necessary to analyze Plaintiff's federal and state claims separately. *Dillon*, 85 F. Supp. 3d at 654.

### A. Title VII Claim for Discrimination Based on Religion

To establish a *prima facie* case for discrimination under Title VII, a plaintiff must show "(1) that she is a member of a protected class, (2) that she was qualified for the position in question, (3) that she suffered an adverse employment action, and (4) that the circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Missick*, 707 F. Supp. 2d at 347 (citing *McDonnell Douglas*, 411 U.S. at 802).

28

Defendants argue that Plaintiff "cannot demonstrate that Defendants discriminated against him because of his religion" and that "other than the fact Plaintiff is a practicing Orthodox Jew and [Defendants] terminated his employment, Plaintiff has not presented any evidence whatsoever that *the reason for his termination* was discrimination." (Mem. in Supp. at 9 (emphasis in original).)

### 1.      The "Same Actor" Inference

As an initial matter, Defendants contend that the length of Plaintiff's employment, as well as the fact that Khachatryan hired Plaintiff knowing that he was Jewish and terminated him approximately three months later, "point away from there being any inference of religious discrimination." (*Id.* at 9.) Defendants claim that Khachatryan knew that Plaintiff was Jewish because his "resume reflects that he is a 'third generation descendant of Holocaust survivors'" (Defs.' 56.1 ¶ 37), he "wore a yarmulke to his interviews" (*id.* ¶ 41), he "discussed being a descendent of Holocaust survivors" "[d]uring the interview with Khachatryan" (*id.* ¶ 42), and he "asked Khachatryan during his interview about time off for Jewish holidays and about needing to leave on Fridays in time for Sabbath" (*id.* ¶ 43). Khachatryan decided to hire Plaintiff (*id.* ¶ 44) and, together with Byrne, Woolley, and DeOssie, decided to terminate him (*id.* ¶ 242).

Plaintiff does not dispute that Khachatryan hired him or was part of a group of four individuals who terminated him. (Pl.'s 56.1 ¶¶ 44, 242.)[4] Nor does he dispute that he wore a yarmulke during his interview with Khachatryan. (OG Dep. at 59:6-16; *compare* Defs.' 56.1 ¶ 41 *with* Pl.'s 56.1 ¶ 41.) Plaintiff disputes that he "discussed his religious beliefs, affiliation, and level of observance" during that interview. (*Id.* ¶ 41.) He also disputes that he discussed Defendants' paid time off policy during the interview. (*Id.* ¶ 43.)

---

[4] In his Statement of Undisputed Facts, Plaintiff states that "Byrne received Woolley's draft of a disciplinary action form at the end of the day of Friday October 13, he must have considered plaintiff's dismissal a top priority on Monday October 16 because Khachatryan were supposed to hold the termination meeting with Plaintiff on October 17." (Pl.'s 56.1 ¶ 242.) However, Plaintiff does not dispute Defendants' statement that Khachatryan jointly made the decision to terminate him.

Under "the 'same actor' rationale . . . when the person who made the decision to fire was the same person who made the decision to hire, especially when the firing occurred only a short time after the hiring, it is difficult to impute to him an invidious firing motivation that would be inconsistent with his decision to hire." *Jetter v. Knothe Corp.*, 324 F.3d 73, 76 (2d Cir. 2003). This rationale "presupposes that the person who hired the plaintiff was aware of the plaintiff's protected characteristic at the time of hiring." *Eldaghar v. City of N.Y. Dep't of Citywide Admin. Servs.*, No. 2-CV-9151 (KMW)(HBP), 2008 WL 2971467, at *9 (S.D.N.Y. July 31, 2008) (quotation and citation omitted).

When multiple people are involved in the decision to terminate (or hire) an employee, the presumption still applies "as long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff." *Ramos v. Marriott Int'l, Inc.*, 134 F. Supp. 2d 328, 345 (S.D.N.Y. 2001). Here, the same management-level employee, Khachatryan, was involved in both the decision to hire and to fire Plaintiff. Although Plaintiff disputes what was discussed during his interview, he does not dispute wearing a yarmulke to the interview or that his resume stated that he is a third-generation descendant of Holocaust survivors. Therefore, Khachatryan knew about Plaintiff's protected status at the time of his hiring and the presumption against an inference of discrimination applies here. The presumption applies with particular force given that Plaintiff was hired and fired within the span of about three months. *See Colon v. Trump Int'l Hotel & Tower*, No. 10-CV-4794 (JGK), 2011 WL 6092299, at *8 (S.D.N.Y. Dec. 7, 2011) (the fact that the same person "was involved in terminating her about three months later undercuts any inference of discriminatory intent").

Because the application of the presumption here does not end the inquiry, it is still necessary to evaluate Plaintiff's claim that he was discriminated against on the basis of his religion. *See Ramos*, 134 F. Supp. 2d at 346 ("However, the same-actor inference is merely plausible and should not be used as a substitute for a thorough factual inquiry.").

2.      **Plaintiff's Allegations of Discrimination**

Plaintiff alleges that he was subjected to three types of discrimination: disparate treatment, discriminatory statements, and discriminatory acts.  The undersigned considers in each in turn.

a.      *Disparate Treatment*

Plaintiff puts forward two examples of disparate treatment.  First, he alleges that his "supervisory sessions" with Woolley were different from the sessions she held with other case workers.  Specifically, he claims that his sessions were longer and that Woolley closed the door when meeting with him, which she did not do for other supervisory sessions.  (*See* OG Dep. at 180:12-25.)

Second, he alleges that Woolley required him to copy her on his emails.  (*See id.* at 181:5-24.) During his deposition, Plaintiff admitted that, unlike him, those employees who did not have to copy Woolley on their emails and who had allegedly shorter supervisory sessions were no longer in their probationary periods.  (*See id.* at 184:5-11, 198:22-199:4.)  Plaintiff said that another of his co-workers, Tsekhanskaya, did not have to copy her supervisor on her emails.  (*See id.* at 192:13-22.)

When "a plaintiff seeks to establish her minimal prima facie case by pointing to disparate treatment of a similarly situated employee, it is sufficient that the employee to whom plaintiff points be similarly situated in all material respects.  In other words, where a plaintiff seeks to establish the minimal prima face case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).

However, it is unnecessary to resolve whether Tsekhanskaya was similarly situated to Plaintiff. Aside from his own "unsupported testimony," Plaintiff provides no further evidence to suggest that the email copying requirement is anything other than a "neutral work place event[ ]."  *Newsome v. IDB*

*Cap Corp.*, No. 13-CV-6576 (VEC), 2016 WL 1254393, at *17 (S.D.N.Y. Mar. 28, 2016) (citation omitted).[5]

### b.   *Discriminatory Statements*

Plaintiff alleges that he was subjected to discriminatory statements while working for Defendants.  He alleges that Khachatryan said, "They lost their faith," "They eat pork," "They don't know what Tu Bishvat is," and "They continued eating when someone passed out." (Aff. ¶ 39.)  He also alleges that Woolley stated, "They are not traditional.  Kosher food is served because of a Jewish center [*sic*]." (*Id.* ¶ 84.)

During his deposition, Plaintiff stated that he heard other antisemitic comments in the office. He testified that he heard co-workers make statements about people getting divorced to get more benefits (*see* OG Dep. at 286:4-21), that Jews cheat on their wives because the wives are always pregnant and that "Orthodox Jews go to Russian bathhouses and stare at women." (*Id.* at 292:5-294:23, 295:18-296:18.)  Plaintiff also testified that Khachatryan commented, "If you are a descendent of Holocaust survivors, you are not entitled to anything." (*Id.* at 269:21-270:3.)  Plaintiff did not hear Khachatryan make this comment himself. (*Id.* at 270:4-7.)

Even drawing all reasonable inferences in Plaintiff's favor, he has failed to establish that he was subjected to discriminatory statements.  All of these comments were made to or about third parties.  None of them were made to or about him specifically.  Such statements cannot form the basis of a Title VII claim.  *See Eugenio v. Walder*, No. 6-CV-4928 (CS)(GAY), 2009 WL 1929311, at *24 (S.D.N.Y. Mar. 3, 2009), *R&R modified on other grounds*, 2009 WL 1904526 (S.D.N.Y. July 2, 2009) (holding that "plaintiffs have not submitted evidence of discrimination by their employer against them" when the alleged discrimination was entirely directed to third parties).

---

[5] Plaintiff also implies that the lengthy closed-door sessions with Woolley and the requirement that he copy her on every email was retaliatory. (*See* OG Dep. at 191:12-17; Aff. ¶ 27.)  These arguments fail for the same reasons explained above.

Moreover, many of the comments are facially neutral. Even assuming "that the targets of these comments" were Jews, this "does not, in itself, support an inference of racial animus." *Garrett v. N.Y.C. Dep't of Educ.*, No. 5-CV-1650 (RER), 2008 WL 11414566, at *10 (E.D.N.Y. Aug. 11, 2008). "There is nothing in the record to permit a rational fact-finder to infer that these" comments were made "*because*" of the targets' religion "rather than *in spite of*" it. *Id.* (emphasis in original).

Finally, Plaintiff testified during his deposition that at Woolley's birthday party, which he could not attend because it took place at a non-kosher restaurant, his "values of kashrut observance were ridiculed." (OG Dep. at 212:21-10.) Plaintiff heard about these alleged statements only from someone else who was at the party. (*Id.* at 213:11-23.) He also testified that he did not "know exact words that was said" about him. (*Id.* at 223:11-12.)

Although these comments were allegedly about Plaintiff directly, Plaintiff's bare bones allegations about them are insufficient to support a *prima facie* case. *See Johnson v. N.Y.C. Dep't of Educ.*, 39 F. Supp. 3d 314, 325-26 (E.D.N.Y. 2014) (plaintiff failed to show that informal statements about African-American students "reflect[ed] a discriminatory animus toward him" and, thus, failed to establish a *prima facie* case). Moreover, the statements are hearsay and, thus, cannot be relied upon to oppose a motion for summary judgment. *See* Fed R. Civ. P. 56(c); Fed. R. Evid 801; *see also Triestman*, 470 F.3d at 477 (stating that "*pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law" (quotation and citation omitted)).

### c.   *Discriminatory Treatment*

In support of his contention that he was treated in a discriminatory manner because of his religion, Plaintiff alleges that he had to bring his own kosher food to the end of summer party and was ridiculed by Khachatryan for keeping kosher, that Woolley suggested he buy a bottle of kosher wine which had been given by a client, and that Woolley took advantage of his absence for religious observance to solicit complaints from clients to damage his reputation.

33

Even drawing all reasonable inferences in Plaintiff's favor, neither Khachatryan's statement about kosher food choices nor Woolley's offer that he purchase the bottle of kosher wine constitutes discrimination.  Similarly, Plaintiff presents no evidence to show that Woolley's decision to call his clients was discriminatory.  Instead, his imputation of discrimination in these instances rests entirely on speculation, and "such conclusory allegations of discrimination are insufficient to satisfy the requirements of rule 56(e)."  *Meiri*, 759 F.2d at 998.

Plaintiff's other allegations of discriminatory conduct—regarding his attempt to speak to attendees at the coffee house about his religious traditions and Woolley's initial reluctance to allow him to take additional days off for religious observance—similarly fail.  By his own admission, Plaintiff was able to observe his religious beliefs: he was allowed to present on the meaning of the four species at the Sukkot coffee house (albeit at the microphone rather than at the individual tables), and he received the additional time off that he requested for the Jewish holidays.

*     *     *

Accordingly, the undersigned finds that Plaintiff has failed to establish a *prima facie* case of discrimination.  In addition, because, as explained above, Defendants set forth legitimate, non-discriminatory reasons for Plaintiff's discharge that Plaintiff was unable to establish as pretextual, the undersigned respectfully recommends granting the Motion with respect to Plaintiff's discrimination claim under Title VII.

## B.      *NYCHRL Claim for Discrimination Based on Religion*

"Discrimination claims under the NYCHRL are analyzed under a broader standard than claims brought under Title VII."  *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 522 (S.D.N.Y. 2019) (citing *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)).  To state a discrimination claim under the NYCHRL, "the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason."  *Mihalik*, 715 F.3d at 110 n.8.

As explained above, Plaintiff has not shown that he was treated less well because of his religion and, therefore, he has failed to establish a *prima facie* case of discrimination under the NYCHRL. *See Shimanova v. TheraCare of N.Y., Inc.*, No. 15-CV-6250 (LGS), 2017 WL 980342, at *7 (S.D.N.Y. Mar. 10, 2017) (granting defendant's motion for summary judgment on plaintiff's NYCHRL when plaintiff "failed to put forward a *prima facie* case" because "the evidence in the record fails to support an inference of discrimination").

Because the undersigned has already found that Defendants have met their burden to show nondiscriminatory reasons for Plaintiff's termination, which Plaintiff has not shown to be pretextual, the undersigned respectfully recommends granting Defendants' Motion with respect to Plaintiff's NYCHRL claim for discrimination based on religion.

## C.   ADEA Claim for Age-Based Discrimination

A plaintiff is required to show the same four elements to establish a *prima facie* case of age discrimination under the ADEA as discrimination under Title VII. *See Missick*, 707 F. Supp. 2d at 347.

Defendants concede the first three parts of the *prima facie* test: that Plaintiff is a member of a protected class; that he was qualified for his position; and that he suffered an adverse employment action. (Mem. in Supp. at 6.) However, they argue that Plaintiff "cannot show that his age was the 'but for' cause of his termination." (*Id.*)

Under the ADEA, it is "unlawful for an employer" "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Such protection extends to employees who are at least 40 years old. *Id.* § 631(a).

In support of his contention that the circumstances of his termination give rise to an inference of age discrimination, Plaintiff points to the experience of his co-worker, Tsekhanskaya, another licensed social worker who was fired shortly before Defendants terminated Plaintiff. According to

Plaintiff, Tsekhanskaya "complained that during interview Khachatryan was trying to root out her age" and that "she was constantly criticized by management for not been able to keep up with her supervisor's fast walk, not maintaining a young look and not using make up." (Aff. ¶ 100.)  In addition, Plaintiff states that "[s]hortly after Tsekhanskaya was fired and just before [his] termination RHSP hired . . . two substantially younger employees outside of the protected class." (*Id.* ¶ 101.)

Tsekhanskaya's statements to Plaintiff about her experiences working for Defendants are hearsay and, therefore, cannot be relied on to oppose a motion for summary judgment. *See* Fed R. Civ. P. 56(c); Fed. R. Evid 801; *see also Triestman*, 470 F.3d at 477.  Moreover, as Defendants state and Plaintiff does not refute, Plaintiff lacks firsthand knowledge about the circumstances of Tsekhanskaya's employment and termination. (*See* Defs.' 56.1 ¶¶ 181-86; Pl.'s 56.1 ¶¶ 181-86.)

Without more, the mere fact that Defendants hired two individuals outside the protected class around the same time that they fired two people within the protected class is insufficient to establish a *prima facie* case of discrimination.  *See Lugo v. City of New York*, 518 F. App'x 28, 29-30 (2d Cir. 2013) (more than *de minimis* showing required to establish discriminatory intent until Title VII).  Furthermore, any inference of discrimination that could be drawn in Plaintiff's favor from this fact is "undermined," *Snowden v. Trs. of Columbia Univ.*, No. 12-CV-3095 (GBD), 2014 WL 1274514, at *8 (S.D.N.Y. Mar. 26, 2014), *aff'd*, 612 F. App'x 7 (2d Cir. 2015), by the undisputed fact that Plaintiff was within the protected class throughout the entirety of his brief employment with Defendants.  (Defs.' 56.1 ¶¶ 28, 49, 244; Pl.'s 56.1 ¶¶ 28, 49, 244.)

Therefore, the undersigned finds that Defendants have established that there is no genuine dispute that Plaintiff cannot establish a *prima facie* case of age discrimination under the ADEA. Further, as explained above, Defendants have also met their burden to show nondiscriminatory reasons for Plaintiff's termination, which Plaintiff has not shown to be pretextual.  Accordingly, the

undersigned respectfully recommends granting Defendants' Motion with respect to Plaintiff's ADEA claim.

### D.    NYCHRL Claim for Age-Based Discrimination

The primary difference between establishing a *prima facie* case of discrimination under the ADEA and the NYCHRL, is that "[u]nder the NYCHRL, a plaintiff need not show that he suffered an 'adverse employment action,' but must show that he was 'treated less well than other employees because of his age.'" *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-5088 (RMB)(HBP), 2017 WL 945932, at *4 (S.D.N.Y. Feb. 16, 2017) (quoting *Mihalik*, 715 F.3d at 110) (alteration omitted).

Defendants established that there is no genuine dispute that Plaintiff was not treated less well because of his age.  Accordingly, the undersigned finds that Plaintiff cannot establish a *prima facie* case of age discrimination under the NYCHRL.

Because the undersigned has already found that Defendants have met their burden to show nondiscriminatory reasons for Plaintiff's termination, which Plaintiff has not shown to be pretextual, the undersigned respectfully recommends granting Defendants' Motion with respect to Plaintiff's NYCHRL claim for age-based discrimination.[6]

### CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that the Motion for Summary Judgment be granted.

Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff and file proof of service no later than March 5, 2021.  Any written objections to this Report and Recommendation must be filed within 14 days of service of this report.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within the specified time waives the right to appeal any

---

[6] Plaintiff also describes "disparaging comments," but does not allege hostile work environment.  (*See* Compl. at p. 5.)  He also states that Defendants engaged in "defamation," but he does not offer any evidence.

order or judgment entered based on this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517

F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:   Brooklyn, New York
             March 2, 2021