IN THE UNITED STATES DISTRICT COURT EASTERN DISTRICT OF NEW YORK

OLEG GERZHGORIN

    Plaintiff, pro se

SELFHELP COMMUNITY SERVICES, INC.
RUSSIAN HOLOCAUST SURVIVORS PROGRAM

    Defendants.

Case No.:   1:18-cv-04344-LDH-PK

Clerk's Office

Filed Date:

(by email) 3/18/2021 4:50 PM

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
BROOKLYN OFFICE

### PLAINTIFF' OBJECTIONS TO REPORT AND RECOMENDATIONS

Pro se plaintiff objects to R&R on a ground of its failure to correctly cite facts, take into consideration and analyze all specific facts in the record, resolve all factual disputes, and draw all reasonable inferences in favor of the non-moving party.

R&R incorrectly stated:

1. **RHSP operates the oldest and largest program for Holocaust survivors in North America…**
In fact, it rather a small program serving some and only Russian speaking Holocaust survivors from the former Soviet Union living in Brooklyn. It is not unheard for Selfhelp to receive complaints about miserable working conditions at RHSP, lack of diversity and cultural sensitivity, workplace bullying, harassment and even "ardent anti-Semitism" what turned out to be a norm after Khachatryan became a new program director. (Plaintiff' "Aff." Dkt. 43, ¶ 65).

2. **Khachatryan knew Plaintiff was an Orthodox Jew when she made the decision to hire him. (Id. ¶ 45.)**
In fact, Khachatryan didn't know plaintiff' religious affiliation. During the interview with Khachatryan plaintiff has not discussed his religious beliefs, affiliation, level of his observance and a paid time off policy. (Plaintiff's Rule 56.1 Statement "Pl.'s 56.1," Dkt. 44, ¶ 41-45).

3. **Plaintiff was told he was expected to make home visits to each of his clients within the first two and a half months of his employment. (Id. ¶ 64.) These home visits were necessary**

1

"**to conduct psychosocial assessments and to assess clients for their needs, including evaluating their living environment and social support system." (Id. ¶ 60.)**

In fact, plaintiff was not required to make home visits to each of his clients within the first 2.5 months of his employment. Even though, plaintiff's clients were new to him, the primary reasons for service were determined and the care plans were created by previous social worker and approved by Woolley. (Pl.'s 56.1, ¶ 64).

4. **Plaintiff claimed that the frequency of client contact was not in writing, so he "just used [his] common sense as a social worker" to determine whether a client needed to be contacted, again relying on the assessments of the prior social worker. (Id. ¶ 67.)**

In fact, the procedure about monthly calls was not clearly defined or reinforced. For example, when plaintiff could not reach some of his clients over the phone during ongoing monthly outreach attempts, Woolley recommended to send them emails even after she realized that most of clients do not have computers. The level of attention to each case was determined on a case-to-case basis during plaintiff' weekly supervision sessions and Woolley had not expressed any concerns about it. (Pl.'s 56.1, ¶ 66-69).

5. **Plaintiff also claimed that the agency's "emergency protocol" only needed to be followed if the worker "think[s] or . . . feel[s] that there is something wrong … going on," not every time a worker is unable to contact a client. (Id. ¶¶ 69-71.)**

In fact, Selfhelp' emergency protocol for homecare or meal delivery workers making scheduled deliveries, wasn't relevant to RHSP' case workers not able to reach their clients over the phone and therefore, has not been used.  (Pl.'s 56.1, ¶¶ 70-71).

6**. Plaintiff was expected to help clients obtain public government benefits, as well as reparation benefits provided through the Conference on Jewish Material Claims Against Germany. (Id. ¶¶ 11, 73.)**

In fact, a primary reason for services at RHSP was providing emergency financial (cash) assistance (ECAP) and plaintiff put in extra time and efforts to connect clients with additional service providers based on perception of their needs.  (Pl.'s 56.1, ¶ 24,73). All plaintiff' clients obtained public, and reparation benefits they were entitled to before cases were assigned to him.

7. **Plaintiff was required to participate in one of three monthly "coffee houses…" (Id. ¶ 77.)**

In fact, plaintiff was required to participate in two of three monthly "coffee houses".

Case 1:18-cv-04344-LDH-PK   Document 52   Filed 03/18/21   Page 3 of 9 PageID #: 1090

8. **His responsibilities for each coffee house were to notify and invite his clients, arrive early to assist with set-up, and interact with clients during the event. (Id. ¶ 78.)**

In fact, plaintiff had increased responsibilities interfering with his own work, and not only in connection with client coffee houses. (Pl.'s 56.1, ¶ 78, Aff. ¶¶ 76-81.)

9. **…there was an "end of summer" party for RHSP staff, organized by Khachatryan to which staff members brought food. Although one person was responsible for buying food using money contributed by other staff members, Plaintiff did not speak to that person about purchasing some kosher food. (Defs.' 56.1 ¶¶ 158-61.)**

In fact, staff members were not supposed to bring their own food. Plaintiff and others, including a person who was responsible for buying food, participated in the email thread about dietary preferences for upcoming party and plaintiff suggested kosher food as one of the choices. Khachatryan who also participated in the email thread responded [to plaintiff' email] that she couldn't care less about food choices including my kosher choice (Pl.'s 56.1, ¶¶ 159-162.)

10. **Defendants allowed an Orthodox Rabbi "to give a lecture about meaning and traditions of High Holidays," even though Woolley considered Plaintiff's holding of the four species on Sukkot, see infra, to be an "explicitly religious activity." (Aff. ¶ 61.)**

In fact, Sukkot follows High Holidays and Woolley considered plaintiff's activity around Sukkot explicitly religious because Selfhelp was recognizing High Holidays only. (Pl.'s 56.1 ¶ 194-195, ¶¶ 37, 53, 61, Aff. ¶¶ 95-96,)

11. **On an unspecified date, Woolley sold Plaintiff a bottle of kosher wine given to one of the social workers by a client because she knew he was kosher and thought he might be interested in it. Plaintiff purchased it for approximately three to five dollars. (Defs.' 56.1 ¶ 163.)**

In fact, Woolley approached plaintiff with a bottle of kosher wine at the time when plaintiff's coworkers discussed in the email thread meal preferences for upcoming "end of summer party" where kosher food was not planned to be available. To add insult to injury, Wooley who was also a part of that email discussion thread acknowledged her sales success in the email to the entire office staff. (Pl.'s 56.1 ¶¶ 163, 164.)

12. **At some time, Woolley told Plaintiff that they serve kosher food at client social events because the events take place in a Jewish center. Plaintiff felt that this was an expression of anti-Jewish feelings because she was generalizing about all clients. (Id. ¶ 171.)**

Khachatryan' and Woolley' statements that Holocaust survivors were entitled to kosher meals at coffee houses solely out of respect to the venue were biased, Anti-Jewish and showed little respect to observant clients and plaintiff, who was observant as well.  (Pl.'s 56.1 ¶171.)

13**. Plaintiff heard co-workers saying… (p.7)**

Upon hearing derogatory anti-Semitic comments and stereotypes, plaintiff felt humiliated, not able to speak, and left the room. Plaintiff did not report this incident because he did not believe it could change anything as his previous informal complaints were met with retaliatory responses. (Pl.'s 56.1 ¶¶ 175,176.)

14. **Plaintiff states that his co-worker Tsekhanskaya told him that Khachatryan said descendants of Holocaust survivors are not entitled to anything. (Id. ¶ 178.)**

In fact, Tsekhanskaya considered this statement explicitly Anti-Jewish because she asked Khachatryan for a reasonable accommodation at work. (Pl.'s 56.1 ¶ 178.) Tsekhanskaya' s statements are not hearsay, her addendum to complaint has been produced to defendants during discovery and mediation (Exhibit T.) Tsekhanskaya emailed plaintiff with her addendum to complaint and later informed him that "someone" from RHSP called and told her not to testify against Selfhelp.

15. **Two days later, during his supervision session with Woolley, Plaintiff again raised the issue of using different musicians. (Defs.' 56.1 ¶ 195.)**

In fact, during his one-on-one supervision session with Woolley, plaintiff again suggested to make coffee houses around the holiday of Sukkot themed events and raised the issue of not hiring the Orthodox musician (Pl.'s 56.1 ¶ 195.)

16. **Khachatryan explained that the issue Plaintiff raised was not a problem.** (Id. ¶ 197.)

In fact, Woolley and Khachatryan considered disrespectful plaintiff's concerns about rejection (not adding to a roster) of the Orthodox musician, inappropriate musical choices and preferred to drop "the subject" as religiously motivated.   ((Pl.'s 56.1 ¶ 82, Khachatryan Aff. ¶ 86.)

17. **However, "Plaintiff continued to argue that they were being religiously and culturally insensitive to the clients and that 'gypsies' should not be singing to clients around significant Jewish holidays." (Id. ¶ 197.)**

In fact, the term "gypsies" came out first and the only time of Woolley's email to Khachatryan confirming that she rejected the Orthodox musician on a ground of not being a good fit after

4

listening to his compositions and admitting that he "plays beautiful and has a nice voice." (Pl.'s 56.1 ¶ 197, Aff. ¶¶ 33, 45.)

**18. However, even though he claims, without support, that Woolley rejected Wax after seeing that he "was dressed as an Orthodox Jew" (Id. ¶ 33), Plaintiff made no complaint…**

In fact, Woolley acknowledged in her September 29 email to Khachatryan ("note on Oleg") that she rejected Wax for not being a good fit for the program. Rejection of Wax was the main topic of discussion before and during September 27 meeting with Khachatryan. Woolley was fed up with plaintiff' advocacy efforts on behalf of Wax and questioning her about not selecting a professional musician who happened to be an Orthodox Jew after she rejected him for not being a good fit. (Pl.'s 56.1 ¶¶ 82, 195-197.)

19. **He did not invite clients at the end of the presentation to approach and hold the four species because he felt his supervisor had prohibited it. He did not ask if he could make that offer. (Id. ¶ 227.)**

In fact, plaintiff could not invite clients at the end of his presentation to come and hold the four species out of concern that it would have thrown the coffee house way off schedule as many of attendees had physical and health impairments. (Pl.'s 56.1 ¶ 227.)

20. **Defendants maintain that one of the other RHSP workers, who is an Orthodox Jew, was already assigned to ensuring that the kitchen was maintained in a kosher manner. (Id. ¶ 122.)**

In fact, the worker identified by RHSP as an Orthodox Jew has never expressed or demonstrated her knowledge of laws of kashrut. Moreover, on some occasions she was bringing milk to coffee houses without inquiring whether ordered food contained dairy or meat ingredients. (Pl.'s 56.1 ¶¶ 119-122.)

21. **Plaintiff took issue with other instances of what he perceived to be insensitivity and discrimination toward observant clients, for example, in the scheduling of trips. "Indeed, many trips were scheduled close to Jewish holidays when observant clients couldn't attend." (Compl. 15.) "Scheduling trips on Shabbat or holidays when they cannot participate is not only culturally insensitive, but also discriminatory." (Aff. ¶ 23.) However,**

5

**he does not present evidence that he raised these concerns with Defendants, as he did with other matters.**

In fact, these issues have been documented in plaintiff' case notes and were a subject of discussions with Woolley during supervision sessions. Plaintiff was advised to address these issues at corporate meetings. Plaintiff has never been invited to corporate meetings.

22**. According to Defendants, by the beginning of <u>December</u>, they "received more complaints [about Plaintiff] than the average worker, within a relatively short period of time … which sent up a red flag about Plaintiff's performance."**

Defendants terminated plaintiff' employment on October 17.

**23. Toward the end of September and early October, Woolley received several complaints from clients and clients' family members about Plaintiff. (Defs.' 56.1 ¶ 123.) Woolley decided in or about the end of September to perform an audit of Plaintiff's client files and case notes "to better evaluate his compliance with work standards." (Id. ¶ 126.)**

All "complaints" were solicited over the phone and documented by Woolley after her October 4 email about "major issues" in plaintiff' performance. This contradicts defendant' statement that clients' complaints triggered his performance audit, exposes inconsistencies and contradictions of why Woolley began the investigation that ended with plaintiff's discharge, and creates an inference of retaliatory intent. (Pl.'s 56.1, ¶¶ 124-127). Plaintiff has not been given a fair opportunity to respond to so called complaints which Woolley solicited on or about October 12 and imbedded in the disciplinary action form sent to Byrne on October 13. (Pl.'s 56.1, ¶ 239.)

24. **However, Plaintiff does not dispute receiving the October 4, 2017 email, the contents of that email, or that he failed to comply with the deadlines set forth therein. (Id. ¶¶ 102, 130, 136-38.)**

Reviewing case notes, discussing its content, and reflecting on issues was one of Woolley' direct supervisory duties. She did not find or failed to address any perceived performance issues before she sent plaintiff unexpectedly controversial and hostile "major issues" email.  The October 4, 2017 email stated that the next review of plaintiff' caseload "will be conducted in the first week of November", therefore, it's not clear how R&R could draw an inference in defendant' favor that plaintiff' alleged non-compliance could become a non-discriminatory explanation for his termination. In fact, plaintiff documented in his case notes his attempts to comply with the deadlines. Plaintiff addressed "3 emergency cases" and documented that "none of the clients and

their caregivers considered it emergency and denied external legal intervention".  Plaintiff also made reasonable efforts to make required 15 home visits "till the end of October", however, he was terminated on October 17. Plaintiff also attempted to contact "missing" and "inactive" clients, however, when he notified Woolley that he was unable to reach some of his clients over the phone, she "recommended to send them emails even after she realized that most of clients did not have computers." (Pl.'s 56.1 ¶¶ 69, 76.)

25**. Defendants contend that Plaintiff cannot establish a prima facie case because the activities he engaged in—advocating on behalf of Defendants' clients—are not, as a matter of law, protected activities that can serve as the basis of a retaliation claim. (Mem. in Supp. at 22-24.) The undersigned agrees.**

In fact, R&R did not take into consideration and failed to analyze all factual allegations on the record including moving plaintiff to the transportation project in retaliation for his informal complaint about kashrut issues at coffee houses affecting all kashrut observant workers because Woolley instructed plaintiff to order extra food for coffee houses (for workers) and leftovers were taken to the office. Plaintiff believes that he was removed from the kitchen, given increased responsibilities, blamed for insubordination (staying in the kitchen), "poor performance" and fired in retaliation for his opposition to perceived discrimination after speaking with Khachatryan about violation of laws of kashrut. (Pl.'s 56.1 ¶¶ 80, 119-122, 230-234.)

26. **Plaintiff does not dispute that his clients made the complaints against him that they did (Compare Pl.'s 56.1¶ 123; with Defs.' 56.1 ¶ 123.)**

In fact, plaintiff was not aware of any complaints from clients during the period of his employment with Selfhelp and he learned about "so called" complaints first time after commencing this lawsuit. (Pl.'s 56.1 ¶¶ 124-126, Aff. ¶ 58). Clients' files or defendants' Ex. Q demonstrate that all "complaints" listed in Defs.' 56.1 ¶ 123 were solicited by Woolley after her October 4 email about "major issues" in plaintiff' performance. This contradicts defendant' statement that clients' complaints triggered his performance audit and creates an inference of biased investigation and retaliatory intent. (Pl.'s 56.1 ¶ 239.)

27. **Plaintiff's Performance Issues…**

In fact, defendants intentionally buried this court under an avalanche of "evidence" of plaintiff' "severe poor performance" (no matter how unreasonably and ridiculous they sounded) to draw attention from unlawful discrimination and retaliation.  (Pl.'s 56.1 ¶¶ 111, 114-116, 216.)

7

Khachatryan and Woolley were satisfied with quality of plaintiff' performance, case notes and care service provision to clients until after this litigation was commenced. (Pl.'s 56.1 ¶ 108.)

28. **Tsekhanskaya's statements to Plaintiff about her experiences working for Defendants are hearsay and, therefore, cannot be relied on to oppose a motion for summary judgment.**

In fact, Tsekhanskaya's statements are not hearsay, her addendum to complaint has been produced to defendants during discovery and mediation (Exhibit T.) Plaintiff has attached the Exhibit T to his response to R&R.

29. **Plaintiff made no complaint in his emails or subsequent discussions that could be considered a complaint of a discriminatory hiring practice. Plaintiff also does not claim that Wax ever applied for employment with Defendants.**

In fact, musicians performing at RHSP' social events are considered independent contractors and their recruitment and retention differs from a common hiring process. Usually, musicians or someone else acting on their behalf were encouraged to submit samples of their music and a designated person decides whether to add him to a roster. Plaintiff found a musician performing Chasidic and Hebrew tunes upon Matevosyan request, received his permission to provide music samples and was instructed by Wooley to email her samples of Wax' music.

By persistently advocating for the Orthodox musician plaintiff demonstrated his opposition to perceived discrimination after Wooley promptly and sweetly acknowledged Wax' talent but procrastinated adding him to a roster. Shortly after September 29 meeting in Khachatryan' office where Woolley was again asked to explain her delay, she stated in her email to Khachatryan that "office" found Wax not being a good fit for RHSP. (Pl.'s 56.1 ¶ 82.)

30. **In November 2017, Plaintiff requested to meet with Byrne to ask about the basis for his termination. (Id. ¶ 261; see also Compl ¶ 26.) During the meeting, Plaintiff asked Byrne if he was Jewish.**

In fact, Byrne did not mention any issues with plaintiff's performance which could have led to his termination, however, stated that plaintiff was not a good fit for the program. Plaintiff asked Byrne if he was Jewish to clarify "not a good fit" clause justifying his termination from RHSP where all clients are Jewish. Plaintiff communicated his good-faith belief that the agency was engaging in prohibited discrimination by firing and not hiring Orthodox Jews (Wax, Tsekhanskaya, Radchenko) with the same "not a good fit" excuse. Byrne, upon receiving Woolley's draft of a disciplinary action form which was full of ungrounded and unknown to HR

8

and plaintiff accusations, should have noticed that Woolley accused plaintiff in teaching religion and even went out on a limb in her bullying demand to send her "daily emails with the list of clients served." However, Byrne had no doubts whatsoever that such prompt dismissal could violate employment discrimination laws. Byrne stated that he disagreed. (Id.) (Pl.'s 56.1 ¶¶ 241, 243, 262-265.)

31. **Plaintiff also describes "disparaging comments," but does not allege hostile work environment. (See Compl. at p. 5.)**

In fact, plaintiff alleged incidents of harassment and hostile work environment at his deposition and in Rule 56.1 statements. If R&R could not take it into consideration, perhaps, plaintiff should be allowed to amend his complaint with respect to this matter. (Pl.'s 56.1 ¶¶ 168, 177, 187, 239.)

                                                              Respectfully Submitted,

                                                              s/Oleg Gerzhgorin
                                                              1818 Ave. L Apt. 4F
                                                              Brooklyn NY 11230
                                                                (718) 913 6846

3/18/21